```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
DAYOUB MARKETING, INC.,                    :

                    Plaintiff,             :      04 Civ. 3125 (WHP)

          -against-                        :      OPINION AND ORDER

S.K. PRODUCE CORP., SHERYL                 :
KANOWITZ, in her individual capacity,
and STEVEN KANOWITZ, in his                :
individual capacity,
                                           :
                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
```

WILLIAM H. PAULEY III, District Judge:

        Plaintiff Dayoub Marketing, Inc. ("Dayoub Marketing" or "Plaintiff") brings this action against S.K. Produce Corp. ("SK Produce"), Steven Kanowitz and Sheryl Kanowitz (collectively, "Defendants") under the Perishable Agricultural Commodities Act, 1930 ("PACA"), as amended, 7 U.S.C. §§ 499a-499t. Plaintiff alleges that SK Produce failed to pay for large quantities of cabbage delivered on credit and that Defendants failed to preserve the proceeds SK Produce derived from those goods, in violation of PACA and in breach of contract. Dayoub Marketing claims that Defendants are liable for the amount of the unpaid invoices, plus interest and collection costs. This Court has jurisdiction pursuant to 7 U.S.C. § 499e(c)(5), 28 U.S.C. § 1331 and 28 U.S.C. § 1367(a) and conducted a bench trial.

        Insofar as the Court exercises its prerogative as finder of fact to determine the weight and credibility of the evidence, the discussion below is limited to the evidence that this Court credits.

FINDINGS OF FACT

Until approximately 1999, Steven Kanowitz operated his family business, Kanowitz Fruit & Produce Company ("KFP"). (Trial Transcript ("Tr.") at 32-33, 42-43.) The company was licensed by the United States Department of Agriculture ("USDA") under PACA to conduct business as a produce dealer. (Tr. at 33-34.) KFP did business with Dayoub Marketing, which sells wholesale quantities of produce and is also licensed as a PACA dealer. (Tr. at 15, 46.) However, after finding that KFP repeatedly failed to make prompt payment on produce that it accepted, the USDA permanently revoked KFP's PACA license in 1997 and barred Steven Kanowitz from working in the produce industry for one year. (Tr. at 33-34, 53-54, 56-57.) See In re Kanowitz Fruit & Produce Co., PACA Docket No. D-95-504, 56 Agric. Dec. 917 (U.S.D.A. 1997), aff'd, Kanowitz Fruit & Produce Co. v. United States, 166 F.3d 1200 (2d Cir. 1998). In June 2000, after pleading guilty to criminal charges of bid-rigging and tax evasion, Steven Kanowitz was sentenced to five months in jail and ordered to pay restitution in the amount of $2.27 million. (Tr. at 33, 43, 50-51, 56.)[1] See United States v. Kanowitz, 00 Cr. 0595 (JSR) (S.D.N.Y.).

Sheryl Kanowitz, Steven's wife, is a secretary for the Baldwin Union Free School District on Long Island. (Tr. at 28.) She was not employed by KFP and has never been involved in wholesale produce transactions. (Tr. at 29, 38, 43.) However, she knew of her husband's criminal case and the USDA's prohibitions on him and his company. (Tr. at 30, 33-34, 40.)

In June 1998, Steven Kanowitz formed SK Produce which operated out of KFP's former office with KFP's personnel. (Tr. at 43-44, 49, 56.) However, because Steven Kanowitz could not obtain a PACA license due to the USDA's restrictions, he decided that his wife should

---

[1] Steven Kanowitz currently runs a new produce brokering company, S.H.K. Produce Brokers, Inc. (Tr. at 42.)

act on behalf of SK Produce for official purposes. (Tr. at 44, 48-49.) Thus, Sheryl Kanowitz signed SK Produce's PACA license application and was on record as the holder of SK Produce's license. (Tr. at 30-31, 34, 49; Plaintiff's Trial Exhibit ("Ex.") 4.)[2] Sheryl Kanowitz also signed the company's incorporation papers and was its president and sole shareholder. (Tr. at 30, 35, 44, 49.) She opened corporate bank accounts and signed its tax returns. (Tr. at 40.) She also received a weekly paycheck from SK Produce of approximately $1,500. (Tr. at 35, 37, 50.) Nonetheless, Sheryl Kanowitz did not actually work for SK Produce or exercise managerial control over the company. (Tr. at 36, 39.) Rather, Steven Kanowitz controlled SK Produce by overseeing two employees who directly managed the company. (Tr. at 9, 36, 45, 52.) Under questioning by this Court, Sheryl Kanowitz claimed to be ignorant of her husband's activities, simply asserting that he was at home when she left for her secretarial job each morning and also there when she returned each afternoon. (Tr. at 41.) If such testimony were credited, it would demonstrate her conscious avoidance. However, this Court declines to credit that testimony.

In 1998, SK Produce contacted Dayoub Marketing to purchase produce. (Tr. at 15-16, 20.) It is Plaintiff's practice to sell on credit only to buyers holding valid PACA licenses. (Tr. at 15-16, 25-26.) Thus, Plaintiff's office manager checked the prospective buyer's credit, ensured that it held a PACA license and learned that Sheryl Kanowitz was its sole officer and owner. (Tr. at 10, 16, 25.) As a result, Dayoub Marketing began selling to SK Produce on credit. (Tr. at 9, 16-17, 25-26.) Neither Sheryl Kanowitz nor Steven Kanowitz personally interacted with Plaintiff on behalf of SK Produce. (Tr. at 10, 23, 31-32, 46, 53.)

---

[2] Steven Kanowitz testified that the USDA "suggested" that he "open up another corporation and put my wife's name in there so the business could continue." (Tr. at 55.) Given Mr. Kanowitz's history with the USDA, this Court finds that testimony incredible.

3

Between September 2000 and January 2001, SK Produce ordered, received and accepted large quantities of cabbage from Dayoub Marketing. (Ex. 1.) Each invoice from this period contains the following language:

> In the event collection actions become necessary, buyer agrees to pay seller's costs and expenses of collection, including attorneys' fees, until account balances are paid in full. Interest shall accrue on any past due balance at the rate of 1.5% per month (18% per annum).

(Ex. 1.) SK Produce never objected to and the parties never discussed this language. (Tr. at 13.)

SK Produce failed to make full payment for the cabbages that it ordered and accepted from Dayoub Marketing between September 2000 and January 2001. (Ex. 2.) In its efforts to collect these past-due payments, Plaintiff spoke only with Steven Kanowitz. (Tr. at 21, 23-24, 26, 46.) It did not attempt to contact Sheryl Kanowitz. (Tr. at 10, 24, 26, 32.)

In January 2001, creditors of SK Produce commenced an action in this Court. See All World Farms, Inc. v. S.K. Produce Corp., 01 Civ. 0580 (WHP) (S.D.N.Y.). Dayoub Marketing knew of that litigation but elected to pursue its remedies administratively before the USDA. (Tr. at 12.) In January 2002, this Court ordered that the assets of SK Produce be liquidated and dispersed among the plaintiffs in the All World Farms action. Therafter, Dayoub Marketing withdrew its administrative claim and commenced this action against SK Produce and the Kanowitzes in April 2004. (Tr. at 12-13.)

Prior to the bench trial, the parties stipulated that the invoices and produce at issue are covered by PACA and that the total amount due on the unpaid invoices is $32,333.50. (Tr. at 9.) They further stipulated that SK Produce and Steven Kanowitz are liable, but dispute whether that liability extends beyond the invoiced amounts. (Tr. at 7-9.) Thus, the only issues before the Court are (1) the liability of Sheryl Kanowitz, and (2) Defendants' liability for interest and collection costs, including attorneys' fees.

4

CONCLUSIONS OF LAW

I. Liability of Sheryl Kanowitz

"Under PACA, purchasers of produce on credit are required to hold the produce and its proceeds, including accounts receivable and derivatives, 'in trust for the benefit of all unpaid suppliers or sellers of such commodities . . . until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers.'" C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 486 (2d Cir. 2001) (quoting 7 U.S.C. § 499e(c)(2)); accord D.M Rothman & Co. v. Korea Commercial Bank of New York, 411 F.3d 90, 93 (2d Cir. 2005). "A PACA trustee's primary duty is to 'maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA].'" D.M. Rothman, 411 F.3d at 93-94 (quoting 7 C.F.R. § 46.46(d)(1)). Although it is typically the company that is held liable for breaching its fiduciary duty, "individual shareholders, officers, or directors of a corporation who are in a position to control PACA trust assets, and who breach their fiduciary duty to preserve those assets, may be held personally liable under the Act." Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 283 (9th Cir. 1997); accord Goldman-Hayden Co. v. Fresh Source Produce Inc., 217 F.3d 348, 351 (5th Cir. 2000); Hiller Cranberry Prods., Inc. v. Koplovksy, 165 F.3d 1, 8-9 (1st Cir. 1999); Top Banana, L.L.C. v. Dom's Wholesale & Retail Ctr., Inc., No. 04 Civ. 2666 (GBD) (AJP), 2005 WL 1149774, at *5 (S.D.N.Y. May 16, 2005) (Report and Recommendation), adopted by 2005 WL 1529736 (S.D.N.Y. June 28, 2005); "R" Best Produce Inc. v. Eastside Food Plaza Inc., No. 02 Civ. 6925 (DLC), 2003 WL 22231577, at *6 (S.D.N.Y. Sept. 30, 2003); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993).

Sheryl Kanowitz was the sole owner and president of SK Produce and the holder of its PACA license on record with the USDA. (Tr. at 35, 44, 49; Ex. 4.) She knowingly signed SK Produce's certificate of incorporation, PACA license application, corporate bank resolutions and tax returns. (Tr. at 30-31, 34, 40.) Sheryl Kanowitz's position in SK Produce and her actions demonstrate her willingness to vouch for the company and hold herself out to the world as the individual primarily responsible for it. Cf. Mid-Valley Produce Corp. v. 4-XXX Produce Corp., 819 F. Supp. 209, 212-13 (E.D.N.Y. 1993) (declining to hold a 100% shareholder personally liable because "she was never an officer, director, or employee of the company" and therefore could only be held liable under a "pierc[ing] the corporate veil" theory). In fact, were it not for her role, it is doubtful that SK Produce could have secured a PACA license to purchase on credit from produce dealers such as Plaintiff. (See Tr. at 15-16, 25-26.) Sheryl Kanowitz voluntarily placed herself in a position to control the PACA trust assets that are at issue in this action.

PACA imposes liability on any individual who was in a position to control trust assets and allows the assets to dissipate. Top Banana, 2005 WL 1149774, at *6 (PACA "imposes strict liability on a PACA trustee if there is insufficient liquid assets to pay the PACA creditors."); Morris Okun, 814 F. Supp. at 349 ("[A]ny failure to account for or preserve trust assets, for whatever reason and however innocent, creates a liability for those trust assets."). As discussed above, the parties stipulated that SK Produce allowed the trust assets to dissipate and that Steven Kanowitz had sufficient control over those assets to be liable. (Tr. at 7-9.) Defendants contend that Sheryl Kanowitz bears no liability because "[s]he did not exercise judgment, direction or control with respect to the activities that violated the PACA." (Defendants' Proposed Findings of Fact and Conclusions of Law ("Def. Mem.") at 7.) However, Defendants' argument divulges the very reason Sheryl Kanowitz is liable: she was in a position

6

to control the trust assets and failed to ensure that they were preserved for Dayoub Marketing. That is, an individual who is the sole shareholder and president of a corporation need not be directly involved in the dissipation of assets to be held personally liable for breach of fiduciary duty as a PACA trustee. See Loi Banana Corp. of Brooklyn v. Cent. Brooklyn Produce Wholesalers & Comm'n Merchs., Inc., No. CV 93-4102 (RJD), 1996 WL 391574, at *2 (E.D.N.Y. July 10, 1996) ("[E]ven assuming the assertions that [the defendant] was only a 'silent partner' were true, it would make no difference. The defendants have conceded [his] role as the principal officer and owner of Central."); Bronia, Inc. v. Seo Young Ho, 873 F. Supp. 854, 861 (S.D.N.Y. 1995) ("Defendant argues that he should not be liable because . . . [he] did not personally misappropriate the trust assets. . . . [H]owever, . . . as the controlling person of Tradefield, he owes a fiduciary duty to the plaintiffs. Therefore, Tradefield's failure to preserve trust assets is also his failure."). By failing to exert her control over SK Produce as present and sole shareholder to prevent the trust assets from dissipating, Sheryl Kanowitz breached her fiduciary duty as a PACA trustee.[3]

Accordingly, this Court finds Sheryl Kanowitz personally liable for breaching her fiduciary duty to preserve the PACA trust assets for the benefit of Dayoub Marketing.

---

[3] In arguing that Sheryl Kanowitz is not personally liable, Defendants rely on 7 U.S.C. § 499a(b)(9), which provides that an individual is not "responsibly connected" to a corporation "if the person demonstrates by a preponderance of the evidence that the person was not actively involved in the activities resulting in a violation of this chapter and that the person either was only nominally a partner, officer, director, or shareholder." However, the statute employs the term "responsibly connected" only in the context of PACA license applications, 7 U.S.C. § 499d(b)-(c), and the grounds for license revocation, 7 U.S.C. § 499h(b). PACA does not condition an individual's liability on a person being "responsibly connected" to the company. Even if this standard applied here (which it does not), SK Produce could not have operated without Sheryl Kanowitz's help in securing a PACA license and acting as its president. Moreover, her complicity in the corporation's activities and failure to adhere to her fiduciary duty led to the PACA violation.

II. Defendants' Liability for Pre-Judgment Interest and Collection Costs

Defendants contend that they are not liable for the interest that has accrued on the unpaid invoice amounts or for Plaintiff's collection costs because the provision establishing those obligations first appeared in Dayoub Marketing's invoices and SK Produce did not specifically agree to it. In any event, Defendants argue, both the 18% annual interest rate set forth in the invoices and the collection costs for which Dayoub Marketing seeks recompense are unreasonable.

PACA does not itself establish a right to interest and collection costs. However, the purchaser is required to pay such items when the parties' contract so provides; in such a case, the interest and collection costs become subject to the PACA trust together with the principal debt. Country Best v. Christopher Ranch LLC, 361 F.3d 629, 632-33 (11th Cir. 2004); Middle Mountain Land & Produce Inc. v. Sound Commodities Inc. 307 F.3d 1220, 1222-26 (9th Cir. 2002); accord E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. 590, 594-95 (S.D.N.Y. 1995); Morris Okun, 814 F. Supp. at 351. Thus, the pivotal question is whether the parties' contract provides for an award of interest and collection costs in favor of Dayoub Marketing.

The parties stipulated that there were no discussions between purchaser and seller regarding these items. (Tr. at 13.) However, each invoice contains a paragraph stating that SK Produce "agrees to pay seller's costs and expenses of collection, including attorneys' fees, until account balances are paid in full" and that "[i]nterest shall accrue on any past due balance at the rate of 1.5% per month (18% per annum)." (Ex. 1.) Between merchants such as Dayoub Marketing and SK Produce, additional terms contained in the seller's invoice become part of the parties' contract unless (1) the buyer expressly limited the seller's acceptance to the terms of the offer; or (2) the buyer objects to the new terms within a reasonable time; and (3) the additional terms materially alter the contract. See N.Y. U.C.C. § 2-207(2)(b); Bayway Ref. Co. v.

8

Oxygenated Mktg. & Trading A.G., 215 F.3d 219, 223 (2d Cir. 2000). Defendants do not contend that they limited their offer or timely objected to the interest and collection cost provision in the invoices. However, they argue that these terms materially altered the contract because the amounts Plaintiff claims for such items are exorbitant compared to the unpaid invoice balance. Because Defendants challenge the inclusion of these terms, they bear the burden of demonstrating a material alteration. See Bayway Ref., 215 F.3d at 223; Avedon Eng'g, Inc. v. Seatex, 126 F.3d 1279, 1284 (2d Cir. 1997).

A material alteration is one that would "result in surprise or hardship if incorporated without express awareness by the other party." N.Y. U.C.C. § 2-207, cmt. 4. New York's Uniform Commercial Code ("UCC") expressly provides that a contract is not materially altered by "a clause [1] providing for interest on overdue invoices [or 2] fixing the seller's standard credit terms where they are within the range of trade practice and do not limit any credit bargained for." N.Y. U.C.C. § 2-207, cmt. 5; see St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc., 687 F. Supp. 820, 827 (S.D.N.Y. 1988) ("No surprise or hardship can be claimed to arise from charging interest on an unpaid bill."). Thus, the provision for interest – even at a rate of 1.5% per month – does not materially alter the parties' contract. See Morris Okun, 814 F. Supp. at 351 (enforcing a term in the invoice through which the defendant agreed that "past due accounts will accrue 1.25% interest per month").

Defendants argue that the collection cost term works a hardship on them because Plaintiff's claimed costs constitute nearly sixty percent of Defendants' principal liability. (Def. Mem. at 9.) Moreover, Defendants argue, rather than joining SK Produce's other creditors in the All World Farms action, Dayoub Marketing incurred unnecessary litigation expenses by pursuing its claims administratively and bringing this action only after the earlier federal action closed. Hardship, however, is assessed as of the time the parties contracted – not retrospectively.

9

See Bayway Ref., 215 F.3d at 226 ("'You cannot walk away from a contract that you can fairly be deemed to have agreed to, merely because performance turns out to be a hardship for you.'" (quoting Union Carbide v. Oscar Mayer Foods Corp., 947 F.2d 1333, 1336 (7th Cir. 1991))). At the time Dayoub Marketing and SK Produce entered into their contracts for the sale and purchase of cabbage, the costs of collection provision should not have surprised SK Produce or presented any hardship. Moreover, like pre-judgment interest, an award of attorneys' fees in a PACA case furthers Congress' intent "to protect agricultural suppliers" by discouraging slow payment by purchasers. E. Armata, 887 F. Supp. at 595; see also Morris Okun, 814 F. Supp. at 351 ("Failure to make . . . an award [of pre-judgment interest and attorneys' fees] may create a disincentive to prompt payment to suppliers and encourage collection litigation while financially strapped purchasers fend off creditors, contrary to the congressional intent evidenced in PACA.").

Nonetheless, this Court notes that the invoices impose liability on the buyer for all of Dayoub Marketing's "costs and expenses of collection," without limitation. Absent a limitation of reasonableness, the additional term creates "open-ended" liability and thus materially alters the parties' contract. See Baway Ref., 215 F.3d at 226; see also N.Y. U.C.C. § 1-203 ("Every contract or duty within this Act imposes an obligation of good faith in its performance or enforcement."). Accordingly, Dayoub Marketing is entitled only to its reasonable collection costs, including attorneys' fees.

While the collection costs are substantial, the record reveals that Defendants and their counsel engaged in hardball tactics that multiplied the costs of pursuing this litigation. For example, Defendants agreed to produce Sheryl Kanowitz for deposition but only two hours before the scheduled start of that examination announced that she would not be produced. Then, despite representations that the only issue for trial would be the personal liability of Sheryl Kanowitz, Defendants' counsel notified Dayoub Marketing's counsel the night before trial that

10

Defendants would not stipulate to anything. That required Plaintiff to prepare for a plenary trial on all issues overnight and fly a witness into New York at the last minute. Thus, Defendants' tactics contributed to the costs of this litigation.

Nevertheless, Dayoub Marketing delayed pursuing its claims and employed two law firms to litigate this relatively straight-forward PACA action. Their respective billing rates are modest by any standard in this District. However, a review of Plaintiff's law firms' billing records reveals overlap and duplication of effort. (Compare Declaration of Thomas G. Aljian, dated Feb. 17, 2005, with Declaration of Mary E. Gardner, dated Feb. 11, 2005.) Accordingly, this Court reduces the claimed attorneys' fees of $23,019.71 by twenty-five percent. This Court will not apply any reduction to the witness' travel expenses. Therefore, Dayoub Marketing is entitled to reasonable attorneys' fees of $17,264.78 and $694.62 for the witness' travel expenses.

## CONCLUSION

For the reasons set forth above, this Court finds Defendants jointly and severally liable to Dayoub Marketing in the amount of $32,333.50, plus pre-judgment interest at the rate of 1.5% monthly, or 18% per annum, and $17,959.40 in collection costs. The foregoing constitutes this Court's findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. The parties are directed to submit a proposed judgment to this Court by November 21, 2005.

Dated: November 9, 2005
        New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

*Counsel of Record:*

Thomas G. Aljian, Jr., Esq.
Podvey, Meanor, Catenacci, Hildner, Cocziello & Chattman, P.C.
1 Riverfront Plaza, 8th Floor
Newark, New Jersey 07102

Mary E. Gardner, Esq.
Patrick J. Reda, Esq.
Keaton & Associates, P.C.
1278 W. Northwest Highway, Suite 903
Palatine, Illinois 60067
*Counsel for Plaintiff*

Paul T. Gentile, Esq.
Gentile & Dickler
261 Madison Avenue
New York, New York 10016
*Counsel for Defendants*